# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TAMMY SADLER,               )
                                       )
      Plaintiff,             )
                                       )
   vs.                   )     No.  4:11CV01257TIA
                                       )
CAROLYN W. COLVIN,[1]       )
Commissioner of Social Security,   )
                                       )
      Defendant.         )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). The suit involves an Application for Supplemental Security Income under Title XVI of the Act. Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in Support of his Answer.

## I.      Procedural History

On March 13, 2007, Claimant filed an Application for Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq,(Tr. 164-69)[2] alleging disability since October 1, 2005 due to diabetes, HBP, short term memory loss, kidney problems, seizures, and gallbladder issues. (Tr. 235). The application was denied (Tr. 95-

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

[2]"Tr." refers to the page of the administrative record filed by Defendant with its Answer. (Docket No. 14/filed September 28, 2011).

99), and Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on April 2, 2009. (Tr. 7-28). In a decision dated June 2, 2009, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act. (Tr. 57-67). On October 5, 2009, the Appeals Council remanded the case to the ALJ to evaluate Claimant's mental impairment, subjective complaints, the degree of functional limitation, if any, resulting from her obesity, and maximum residual functional capacity and to obtain vocational expert testimony. (Tr. 68-72).

Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on February 24, 2010. (Tr. 29-54). Vocational Expert Vincent Stock also testified at the hearing. (Tr. 48-53, 162-63). In a decision dated April 23, 2010, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act. (Tr. 73-87). After considering the representative brief, the Appeals Council denied Claimant's Request for Review on November 10, 2010. (Tr. 1-4, 289-91). Thus, the ALJ's decision is the final decision of the Commissioner.

## II.     Evidence Before the ALJ

### A.  Hearing on April 2, 2009

#### 1.  Claimant's Testimony

At the hearing on April 2, 2009, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 7-28). At the time of the hearing, Claimant was forty-five years of age. (Tr. 11). Claimant's date of birth is February 8, 1964. Claimant is married and lives in a trailer with her husband. (Tr. 11). Claimant completed the ninth grade in special education

classes. (Tr. 12). Claimant can read and write and is right-handed. (Tr. 13). Claimant stands at four feet eleven inches and weighs 178 pounds. (Tr. 13).

Claimant last worked in 2002 at the Blue Owl Restaurant washing dishes and helping prep food. (Tr. 14). Claimant also worked at the same time at a hospital as a dietary aide cooking food, placing food on the trays, and sometimes delivering the food trays. (Tr. 14-15). Claimant worked at Holiday Inn in the kitchen by cooking and setting up buffets. (Tr. 15). Claimant testified that she stopped working in 2002 after recovering from a partial hysterectomy, and the owner of the Blue Owl told her she no longer had a job. (Tr. 15-16). Claimant's conditions started to become worse. (Tr. 16).

Claimant filed her application in 2007, because the diabetic seizures prevented her from working. (Tr. 16). Claimant testified she took insulin injections as treatment and then an insulin pump for almost a year. (Tr. 17). Claimant wears the pump twenty-four hours a day except when showering as prescribed by Dr. Thampy. (Tr. 18). Claimant has not had any more seizures since the insulin administration. (Tr. 19).

Her diabetes affects her functioning ability causing Claimant to lose her balance. (Tr. 18). Claimant walks with a cane to help her from falling after slipping on a wet deck and breaking her ankle. (Tr. 18-19). Claimant testified that she has told her doctor about her balance issues, and her doctor told her to walk toe to toe. (Tr. 19).

Due to her fatigue, Claimant sleeps for five hours during the day three to four days a week. (Tr. 20). Claimant collapsed into a diabetic coma and rushed to the hospital when her sugars reached over 600. (Tr. 22). Claimant was in the ICU for a week in the diabetic coma. (Tr. 22). At that time, Claimant had been injecting four shots a day, but her sugars were still out of control.

(Tr. 23). Dr. Thampy, a diabetes specialist, decided to have Claimant use the insulin pump. Her kidneys are functioning between 50 to 60 percent. (Tr. 23). Claimant testified in the last two months, her sugars have been between 150 and 231. (Tr. 22). Claimant testified that she has uncontrolled blurred vision in her right eye caused by her diabetes. (Tr. 23).

Claimant testified if she walks a distance or stands on her feet all day, her feet hurt. (Tr. 25). Claimant can walk one block before her feet start hurting. (Tr. 25). Claimant can stand for about 15 to thirty minutes and then she has to sit down. (Tr. 26).

### B. Hearing on February 24, 2010

#### 1. Claimant's Testimony

At the hearing on February 24, 2010, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 29-44). At the time of the hearing, Claimant was forty-six years of age. (Tr. 34). Claimant lives with her husband and two adult children. (Tr. 35). Claimant weighs 200 pounds, and acknowledged doctors have recommended that she lose weight, and she is on a 1500 calorie diet. (Tr. 37). Claimant left school after the ninth grade, because she was pregnant. (Tr. 48).

Claimant testified that she last worked in 2001 washing dishes at the Blue Owl Restaurant. (Tr. 36). Claimant's fatigue and uncontrolled blood sugars prevent her from working. (Tr. 36).

Claimant is on an insulin pump, and has not been able to keep her blood sugars under control for the last eight to nine months. (Tr. 36). Before that time, Claimant testified that she had been able to keep her blood sugars under control. Claimant checks her blood sugars three to five times a day. (Tr. 37). Claimant is fatigued all the time. (Tr. 36).

Claimant smokes a half a pack a cigarettes each day. (Tr. 37). Claimant is scheduled to see a lung specialist about quitting smoking. Claimant agreed that her continued smoking is not a good idea, because she has some breathing problems. (Tr. 37). Claimant uses an inhaler when she wheezes and coughs a lot. (Tr. 42).

Claimant testified that she has a problem with her neuropathy, but she has not been able to find a podiatrist who would take Medicaid. (Tr. 38). Claimant has problems with any feeling in both her hands causing her problems picking up items off a table. Claimant has not returned for treatment after the carpal tunnel surgery. (Tr. 38-39). Claimant testified that her blood pressure has been under control on her medication. (Tr. 39).

Claimant does well on her depression medication, but she is mean if she fails to take her medication. Claimant testified a psychiatrist or psychologist treated her once a long time ago. (Tr. 39). If she fails to take her depression medication, Claimant has problems concentrating. (Tr. 43). Although Claimant testified that she has crying spells a couple times a week, she has not sought counseling. (Tr. 43). Her kidney doctor prescribes Lexapro, and Lexapro controls her depression. (Tr. 40). Claimant testified that her medications help her. (Tr. 42). The medication for her GERD helps to a certain point depending upon what she eats. (Tr. 42).

Claimant testified that on a typical day, she sleeps most of the day. (Tr. 40). Once in awhile, she cooks. Claimant cannot shower without assistance, because she is scared of falling. (Tr. 40). Claimant testified that she can walk half a block and stand for a couple of hours. (Tr. 41). After sitting for a couple of hours, her back and hip start to hurt. Claimant testified that she can probably sit for six to eight hours at one time before she has to stand up and stretch. Claimant can pick up about ten pounds on occasion. (Tr. 41-42).

Claimant testified last week she had a cardiac catheter as treatment for blockage in her legs. (Tr. 43-44). Prior to her procedure, Claimant experienced symptoms including muscle pain in her legs and numbness in her feet, and she would take pain medication, Neurontin. (Tr. 44). Claimant takes water pills twice a day to prevent swelling in her legs. (Tr. 44). Before the procedure, Claimant testified that she elevated her legs for three to four hours a day to alleviate the pain and swelling. (Tr. 45). Claimant testified that she is tired, and she sleeps a lot. (Tr. 45). Claimant does not sleep through the night, and she sleeps three to four hours during the day. (Tr. 46).

Claimant testified that she could not return to her job as a dietary aide, because she would have memory problems, and she could not be on her feet that long. (Tr. 47-48). Claimant testified she could not work an eight hour day without taking a three hour nap. (Tr. 48).

## 2. Vocational Expert Testimony

Vocational Expert Vincent Stock, a vocational rehabilitation expert/licensed psychologist, testified in response to the ALJ's questions. (Tr. 48-53, 162-63). Mr. Stock identified the dietary aide position as the only SGA, and Claimant earned $9,800. (Tr. 49). After discussing whether Claimant worked as a nurse aide or a dietary aide, the ALJ decided to presume Claimant had no past relevant work. (Tr. 50).

The ALJ asked Mr. Stock to assume that

> an individual the claimant's age, same education level, no past relevant work. The individual is limited to performing light exertional level work. The individual can occasionally climb stairs and ramps, never climb ropes, ladders or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, pushing and pulling with the legs is limited to frequent, not constant. There should be no operation of foot controls. The individual needs to work in a temperature controlled environment and should avoid concentrated exposure to pulmonary irritants, unprotected heights, excessive vibration, hazardous machinery, and we're going to limit the individual to performing unskilled work only.

(Tr. 51). Mr. Stock opined that an individual with those limitations could perform including a housekeeping position, an unskilled job at the light level with 10,000 jobs in the State of Missouri and 400,000 in the national economy, and no restriction on being with the public; and a fast food worker, unskilled job at the light level with 12,000 jobs in the State of Missouri and 480,000 in the national economy. (Tr. 51).

Next, the ALJ asked Mr. Stock to assume that

the same number one, but we're going to reduce the exertional limitation down to sedentary work as opposed to light. Are there any jobs in the national or regional economy that an individual with all those limitations could perform?

(Tr. 51-52). Mr. Stock opined that an individual could work as an assembly line fabricator, an unskilled job at the sedentary level with 3,000 jobs in the State of Missouri and 120,000 in the national economy; and a wafer breaker semiconductor job with 2,500 jobs in the State of Missouri and 100,000 in the national economy. (Tr. 52).

In the last hypothetical, the ALJ asked Mr. Stock to assume the same as number two with the additional limitations

any job must allow for unscheduled disruptions above the work day and work week secondary to the necessity to lie down for extended periods of time during the day, inability to concentrate for a full eight hours during the work day, necessity to miss more than two or three days per month at work because of doctors' appointments, treatments and those types of things. Would there be any jobs in the national and regional economy that an individual with all of those limitations could perform?

(Tr. 52). Mr. Stock responded no. (Tr. 52).

Claimant's counsel asked Mr. Stock whether the assembly line fabricator and semiconductor wafer breaker jobs require frequent use of the hands. (Tr. 53). Mr. Stock responded yes and agreed that any functional capacity of less than frequent use of the hands would

not be able to do those jobs.  (Tr. 53).

### C.  Work History and Application Forms

On her Work History Report, Claimant indicated that, from 1998 to 2002, she worked as a dishwasher at a restaurant and from 2000 to 2001, she worked as a healthcare aide.  (Tr. at 222). In the dishwasher position, Claimant washed dishes, emptied trash cans, take trash to dumpster, and take dishes to banquet room.  (Tr. 227).

In the Function Report - Adult, Claimant reported her daily activities to include doing some house work, cooking dinner with her daughter's assistance, doing the laundry, and taking care of the dog and the bird.  (Tr. 244-46).  Claimant cooks meat, vegetables, and pasta for dinner, and cooking dinner takes an hour each day.  (Tr. 246).  Claimant drives to the grocery store once a week and does the grocery shopping for an hour.  (Tr. 247).  She listed watching television and playing games as her interests and doing pretty good.  (Tr. 248).

### III.    Medical Records

The June 7, 2005 EKG showed no seizure activity present during the recording and normal results.  (Tr. 337).

On January 9 and March 27, 2006, Dr. David Glick treated Claimant's hypertension and prescribed medication as treatment.  (Tr. 334).  In a follow-up visit on June 27, 2006, Claimant reported being out of her hypertension medications for one month.  (Tr. 333).  Dr. Glick restarted Prinzide.  The Tilt Table Test Results were normal, and Dr. Glick opined he had no explanation for Claimant's spells and noted all tests suggest nothing serious.  (Tr. 333, 335-36).

On May 8, 2006, on referral by Dr. Glick, Dr. Nizar Assi evaluated Claimant for syncopal episodes and possible seizure activity versus cardiac arrhythmias.  (Tr. 307).  Claimant reported

- 8 -

having two episodes of near syncope in December. Dr. Assi listed asthma, hypertension, polycythemia, and mild obstructive sleep apnea per sleep study ast her past medical history. (Tr. 307). She smokes anywhere between on pack every two days to one pack per day depending upon her level of stress. (Tr. 308). Her current medications included aspirin, lipitor, and lisinopril/hydrochlorothiazide. The physical examination showed Claimant to be alert and oriented and in no acute distress. Dr. Assi noted her mood and affect to be normal. Examination showed Claimant to move all extremities well and her gait to be normal. (Tr. 308). Dr. Assi found her symptoms to be consistent with seizure activity on several occasions and scheduled an echocardiogram to assess any structural heart disease or valvular disease and a stress Cardiolite study. (Tr. 309). Dr. Assi noted that her blood pressure remained suboptimally controlled and prescribed cardizem daily. (Tr. 308).

On May 12, 2006, Dr. Assi evaluated Claimant for chest discomfort. (Tr. 304). Dr. Assi recommended performing a cardiac catheterization based on the results of the stress Cardiolite test cardiac showing small mid anterior, nontransmural, reversible defect. (Tr. 304, 306).

The September 11, 2006 abdominal ultrasound showed an enlarged fatty liver. (Tr. 414).

On September 26, 2006, Claimant reported having stomach problems to Dr. Glick. (Tr. 330). Dr. Glick noted Claimant has gained weight, over thirty pounds, from the last year and counseled her on weight management. (Tr. 329).

On November 10, 2006, Claimant received treatment in the emergency room at Des Peres Hospital for right posterior chest pain after losing her balance and hitting the rail in the hallway. (Tr. 317, 319). The doctor diagnosed Claimant with right chest wall contusion. (Tr. 318).

On November 11, 2006, Dr. Benjamin Albano treated Claimant's acute pancreatitis and

extremely poor peripheral veins, necessitating more substantial IV access. (Tr. 353). Physical examination showed motor skills 5/5 in all four extremities. (Tr. 387). Claimant smokes one pack of cigarettes a day. (Tr. 353). The CT scan of her abdomen and pelvis showed inflammatory region in the region of the pancreas consistent with acute pancreatitis. Dr. Albano prescribed a triple lumen catheter placed at her bedside. (Tr. 353). Dr. Albano admitted Claimant to Jefferson Memorial Hospital for treatment of her abdominal pain. (Tr. 382). In the emergency room, Claimant reported one-day history of abdominal pain, nausea, vomiting, and inability to keep anything down. (Tr. 382). Dr. Albano started an aggressive IV fluid hydration and IV insulin drip. (Tr. 383). Dr. Albano surgically placed a right subclavian vein triple lumen catheter as treatment. (Tr. 355). In the November 22, 2006 Discharge Summary, Dr. Albano listed diabetic ketoacidosis, acute pancreatitis, acute chronic renal insufficiency, hyperlipidemia, anxiety depression, gallbladder dyskinesia, elevated alkaline phosphatese, and urinary tract infection in the discharge diagnosis. (Tr. 391).

Dr. Albano evaluated her elevated BUN and creatinine on November 13, 2006. (Tr. 384). Claimant had abdominal pain and pancreatitis and is a new diabetic and been hypertensive for some years. Claimant reported "her care only off and on with her primary doctor, Dr. Glik [*sic*], over the past several years." (Tr. 384). Dr. Albano noted Claimant to be obese. Claimant still smokes about half a pack to a pack daily. Claimant has some fatigue and generalized weakness. (Tr. 384). Examination showed Claimant to be alert and oriented times three and motor examination showed grossly normal. (Tr. 385). CT of her abdomen suggested acute pancreatitis and diffuse mild fatty infiltration of the liver. Dr. Albano listed in the impressions: acute renal failure from acute pancreatitis, profound hypocalcemia, marked anemia, better, underlying chronic kidney disease

stage 2 secondary to diabetes and hypertension, fatty liver, acute necrotizing pancreatitis, history of diabetes, hypertension and dyslipidemia, and known coronary artery disease. Dr. Albano changed the intravenous fluids to half normal saline plus two amps of bicarb at 150 cc an hour. (Tr. 385)

In follow-up treatment on December 8, 2006, Claimant reported not taking the medications she was discharged on because of nausea. (Tr. 424). Claimant has been smoking a half pack of cigarettes each day since age thirteen. (Tr. 424). Dr. Albano noted Claimant had acute pancreatitis and diabetic ketoacidosis in November, and his assessment included diabetic mellitis with ketoacidosis and uncontrolled and benign hypertension. Dr. Ablano continued her medication regimen. (Tr. 425).

On December 18, 2006, Dr. Gregg Ginsburg evaluated Claimant at the request of her primary care physician for recommendations with regard to diagnosis and treatment of her recent episode of pancreatitis. (Tr. 346). She has abdominal pain associated with dyspepsia, intermittent in nature and typically aggravated by foods. Claimant reported having good general health lately and having diabetes. Claimant smokes. (Tr. 346). Examination showed normal range of motion of her extremities. (Tr. 347). Dr. Ginsburg assessed Claimant with billiary dyskinesia, cholecystitis nos, and pancreatitis resolved. (Tr. 347).

On January 2, 2007, Claimant called Dr. Glick's office and noted she would not be returning to his office for treatment inasmuch as she was rushed to the hospital in November and her BS was over 600 and she now is on insulin. (Tr. 329). She complained that Dr. Glick had not completed any blood work in over one year, and so she now has a new primary care physician closer to where she lives. (Tr. 329).

In a follow-up visit on January 29, 2007, Claimant denied any abdominal pain. (Tr. 348). Dr. Ginsburg found Claimant to be doing extremely well status post lap cholecystectomy. (Tr. 349).

Claimant returned for follow-up treatment on February 9, 2007. (Tr. 426). Dr. Albano treated her diabetes mellitus type 2 and benign hypertension with medications. (Tr. 426). On February 28, 2007, Claimant returned complaining of chest pains for three weeks. (Tr. 428). Dr. Albano continued her medications and referred Claimant to a specialist for treatment. (Tr. 429).

In the Physical Residual Functional Capacity Assessment dated April 24, 2007, Dr. Muckerman-McCall listed diabetes mellitus, poor control as Claimant's primary diagnosis, and pancreatitis, chronic kidney disease as her secondary diagnosis. (Tr. 442). The doctor indicated that Claimant can occasionally lift twenty pounds, frequently lift twenty ten pounds, and stand and walk about six hours in an eight-hour workday. (Tr. 443). The doctor noted that Claimant can sit about six hours in an eight-hour workday and has unlimited capacity to push and/or pull other than shown. (Tr. 443). As evidence in support, the doctor noted how her last examination on March 13, 2007 was negative. (Tr. 444). The doctor indicated that Claimant has no established visual, manipulative, communicative, or environmental limitations. (Tr. 444-46). In support, the doctor noted how Claimant manages household chores with her daughter's help, and she reports memory problems. (Tr. 447).

On June 6, 2007, on referral by Disability Determinations, Dr. Sherman Sklar evaluated Claimant and reviewed the treatment notes of her family physician. (Tr. 450). Dr. Sklar noted that all of Claimant's symptoms relate to her diagnosis of diabetes made in November 2006. Claimant reported being is a diabetic coma for a week and having several diabetic seizures and memory loss.

- 12 -

(Tr. 450). She is not receiving any outpatient psychiatric treatment and has not history of hospitalization for psychiatric treatment. (Tr. 451). Claimant lives in a trailer with her husband and two children. (Tr. 453). Claimant does the cooking, the household chores with the help of her children, and the grocery shopping. She can drive. She enjoys television and playing cards. Although Claimant reported having problems forgetting things, Dr. Sklar observed during the examination Claimant showed no signs of conversational wondering, no rambling in her conversation and thinking, and she stayed on track. Dr. Sklar assessed her GAF to be 65. (Tr. 453).

In the Psychiatric Review Technique, completed on June 14, 2007, Dr. Judith McGee found Claimant to have no medically determinable impairment and no functional limitations. (Tr. 455-64). Dr. McGee noted that Claimant has no history of mental health treatment other than reporting taking some anti-anxiety medications a couple of years ago. (Tr. 465). Claimant reported poor memory since being in a diabetic mellitus coma for a week, but during examination, Claimant "was fully oriented, exhibited the ability to recall 4/6 digit given and did serial 3's without error as well as simple math problems. The examiner notes no signs of conversational wandering or rambling in her conversation/thinking." The examiner noted how Claimant stayed on track. Dr. McGee noted that Dr. Sklar cited no findings consistent with a DSM IV diagnosis, and therefore, she offers no medically determinable psychiatric review technique finding. (Tr. 465).

On June 26, 2007, Claimant reported high stress in the family and problems sleeping. (Tr. 473). Dr. Albano continued her medication regimen for diabetes mellitus and benign hypertension and prescribed Celexa. (Tr. 474). In a follow-up visit on September 26, 2007, Dr. Albano treated her benign hypertension and diabetes mellitus type 2 with renal manifestations, not stated as

uncontrolled.  (Tr. 475).

The July 19, 2007 CT of Claimant's head because of memory loss showed no acute intracranial abnormality.  (Tr. 486).

On December 19, 2007, Dr. K. George Thampy at Endocrinology, Diabetes & Metabolism Consultants at St. Anthony's saw Claimant in consultation for diabetes millitus.  (Tr. 470).  Dr. Thampy observed Claimant to be alert, have good affect, judgment, and insight.  He found Claimant has type 1 diabetes complicated by hypoglycemia secondary to hyperinsulinemin.  Dr. Thampy discussed role of diet, exercise and weight-loss in the overall management of diabetes.  He noted her hypertension to be in good control and noted she needs a better diet.  Dr. Thampy recommended dietary consultation, exercise, and weight loss and the need to quit smoking.  (Tr. 470).

On January 8, 2008, Claimant reported fatigue and recently diagnosed with polycythemia and continued smoking.  (Tr. 477).  Dr. Albano continued her medication regimen.  (Tr. 478).

On January 9, 2008, Dr. Stephen Janney of Missouri Hematology & Oncology Care evaluated Claimant for possible polycythemia vera.  (Tr. 488).  Dr. Janney noted Claimant has been diagnosed with diabetes and is on insulin and her renal failure has slowly improved.  (Tr. 488).  Her current medications include Celexa, Lipitor, NovoLog, aspirin, and Diovan.  (Tr. 489).  Dr. Janney counseled Claimant to stop smoking.  Claimant reported doing better on Celexa.  Examination showed Claimant to be obese, and she is alert and oriented.  (Tr. 489).  Dr. Janney found Claimant has an erythrocytosis.  (Tr. 490).  Dr. Janney opined with her smoking, "it may be hard to determine for sure whether this is a primary polycthemia or secondary polycythemia."  (Tr. 490).

In follow-up treatment fo polycythemia/erythrocytosis on January 16, 2008, the lab results showed an elevated white count. (Tr. 497). Dr. Janney recommended Claimant see Dr. Jackson for further evaluation. (Tr. 497-98). In the past, Claimant has sleep apnea although not severe. (Tr. 498).

The January 18, 2008 chest exam showed no active pulmonary disease. (Tr. 526).

On January 23, 2008, Dr. W. Mark Breite evaluated Claimant for sleep apnea on referral by Dr. Janney. (Tr. 510). Dr. Breite noted that Claimant had seen Dr. Jackson five years earlier, but she did not keep her follow-up treatment and continued to smoke. (Tr. 510). Dr. Breite listed COPD/asthmatic bronchitis and OSA in the Impressions. (Tr. 511). Dr. Breite scheduled an overnight for baseline evaluation and discussed smoking cessation strategies and wrote a prescription for Chantix and prescribed Nasonex. (Tr. 511).

The Polysomnography Interpretation of January 30, 2008, showed minimal nocturnal hypoxemia. (Tr. 532-33). Dr. Jackson opined that Claimant has a history of polycythemia which is felt to be secondary to chronic obstructive pulmonary disease and tobacco use habituation. (Tr. 532). Claimant continues to smoke and drinks caffeinated beverages before bedtime. (Tr. 532). Dr. Jackson found that Claimant does not appear to have sufficient abnormality of oxygenation overnight to result in secondary polycythemia and so he must consider other etiologies for this phenemenon. (Tr. 533). Dr. Jackson noted Claimant would benefit from improved sleep hygiene and avoidance of prolonged lying in bed without sleeping, avoidance of caffeine in the afternoon and evening hours, and elimination of nicotine. Dr. Jackson further found Claimant to be in excess of ideal body weight and recommended a program of supervised diet and exercise for weight loss as this would likely improve her sleep breathing disorder. (Tr. 533).

In the February 26, 2008 Office Note, Dr. Jackson noted Claimant continues to smoke a half pack to a pack of cigarettes per day, and she claims she cannot afford the Chantix for smoking cessation. (Tr. 561). Dr. Jackson noted minimal nocturnal hypoxemia and mild obstructive airways disease and evidence of some bronchial activity with an asthmatic bronchitis phenomenon. (Tr. 562). Dr. Jackson counseled Claimant regarding the imperative for smoking cessation and explained how obstructive airways disease with a reactive component would be expected to improve with smoking cessation. (Tr. 562).

On March 15, 2008, Dr. Thampy treated Claimant and noted that she appeared to be alert, not depressed, and to have good affect, good judgment and insight. (Tr. 555). Dr. Thampy discussed the role of diet, exercise, and weight loss in the overall management of diabetes. He noted her hypertension to be in good control. Dr. Thampy recommended dietary consultation, exercise, and weight loss. Dr. Thampy explained the ill effects of smoking and the need to quit. (Tr. 555).

On April 10, 2008, Claimant reported progress in cutting down on smoking, but she has been unable to quit. (Tr. 563). Dr. Jackson counseled Claimant once again about the importance of smoking cessation for ten to twelve minutes. (Tr. 564). Dr. Jackson discussed using an alternative approach when she normally smokes cigarettes, such as after meals, like taking a brisk walk. (Tr. 564).

In a follow-up visit on July 17, 2008, Dr. Thampy recommended dietary consultation, exercise, and weight loss and discussed the need to quit smoking. (Tr. 558).

On August 14, 2008, Claimant reported doing quite well and not requiring emergency room visit since her last clinic appointment. (Tr. 568). Claimant still smoking half to one pack of

cigarettes per day. (Tr. 568). Dr. Avellone encouraged Claimant to continue her efforts to stop smoking and to return in six months for evaluation. (Tr. 569).

On October 8, 2008, Claimant reported right side kidney pain to the doctor in the emergency room at Jefferson Memorial Hospital. (Tr. 571). The doctor diagnosed Claimant with abdominal pain and instructed her to avoid smoking, caffeine, and spicey foods and to take Pepcid. (Tr. 574). The radiology report showed her pancreas to be within normal limits. (Tr. 587). The CT of her abdomen showed no evidence of pancreatitis. (Tr. 589).

On October 16, 2008, Dr. Thampy noted Claimant to have gained two pounds since her last visit. (Tr. 646). Dr. Thampy recommended dietary consultation, exercise, weight loss, and smoking cessation. (Tr. 646).

On October 21, 2008, Claimant received treatment in the emergency room at St. Anthony's Hospital for abdominal pain. (Tr. 602). The doctor diagnosed her with abdominal pain of unknown etiology. (Tr. 602). The Computed Tomography of her abdomen and pelvis showed multiple left adnexal cysts. (Tr. 613). The chest x-ray showed no active disease. (Tr. 614).

On November 17, 2008, Claimant received treatment in the emergency room at St. Louis University Hospital after slipping and falling on a wooden deck and injuring her right ankle. (Tr. 619). The impression noted left ankle fracture. (Tr. 620). On November 20, 2008, Claimant received treatment for ankle fracture. (Tr. 723-24). In the November 26, 2008 Office Visit Note, Claimant reported slipping and falling at a restaurant on November 14, 2008. (Tr. 725). Claimant reported weightbearing despite instruction otherwise and continued smoking despite instruction to discontinue smoking. The doctor diagnosed Claimant with left ankle fracture and placed a short-leg case on her ankle as treatment. The doctor gave "strict instructions to nonweightbear on the

left lower extremity as well as to discontinue her smoking as it will inhibit bone healing." (Tr. 725). In the return visit on December 17, 2008, the doctor noted Claimant "has been weightbearing through her cast, despite instruction that she is not to be weightbearing." (Tr. 728). The doctor noted how Claimant continued to walk, "despite our best efforts to try to impress on her the importance of being non-weightbearing on the let lower extremity. We instructed her that she should continue to be non-weightbearing on the left lower extremity. We also instructed her that if she does not show more signs of healing at the next visit, and if she does not remain non-weightbearing she may not show more signs of healing at the next visit, that she may require surgical fixation to get her fracture site to heal." (Tr. 728).

On January 15, 2009, Dr. Thampy recommended dietary consultation, exercise, weight loss, and smoking cessation. (Tr. 649).

In a follow-up visit on January 21, 2009, the doctor noted Claimant continues to ambulate and bear weight on the air cast. (Tr. 731). The doctor told her to maintain the non weightbearing status on her lower left extremity, but he noted "the patient and her husband both admit today that the patient has been extensively bearing weight as tolerated on her left lower extremity." (Tr. 731). The doctor opined that Claimant "should ideally continue to be non weightbearing at this time in her air cast boot. She was apprised of this and agreed to continue wearing the boot. We again expressed to her how important she maintains a non weightbearing status on the left lower extremity." (Tr. 731). On March 11, 2009, the doctor noted Claimant has been bearing weight as tolerated on the lower left extremity. (Tr. 734). Claimant reported no pain and able to walk around as needed and no recent trauma. The doctor released Claimant from the clinic and noted that she may bear weight as tolerated and pursue activities as tolerated on the lower left extremity.

(Tr. 734).

In a follow-up visit on May 7, 2009, Dr. Thampy observed Claimant to be not depressed, to have good affect and to be alert.  (Tr. 652).  Dr. Thampy noted "[e]xcellent control with rare hypoglycemia."  He discussed the role of diet, exercise, and weight loss in overall management of diabetes.  Dr. Thampy also explained the effects of smoking and discussed the need to quit.  (Tr. 652).

On June 23, 2009, Claimant reported injuring her ankle while walking along road after her truck broke down.  (Tr. 638).  The doctor at St. Anthony's Hospital diagnosed Claimant with ankle sprain.  (Tr. 640).

In follow-up treatment on September 3, 2009, Dr. Thampy treated Claimant's diabetes mellitus.  (Tr. 655).  Dr. Thampy observed Claimant to have no difficulty standing and to have a normal gait.  (Tr. 652).

On October 26, 2009, Claimant received treatment in the emergency room at St. Anthony's Medical Center for chest and epigastric pain.  (Tr. 663-92).

On November 10, 2009, Claimant received treatment in the emergency room at St. Anthony's Medical Center for hyperglycemia.  (Tr. 694-706).

On November 17, 2009, Claimant received treatment in the emergency room at St. Anthony's Medical Center for chest pain and shortness of breath.  (Tr. 708-15).  The doctor diagnosed Claimant with bronchitis and COPD.  (Tr. 716).

On January 19, 2010, Dr. Dwayne Helton, D.O., evaluated Claimant at the urging of her endocrinologist and nephrologist.  (Tr. 738).  Dr. Helton noted no fatigue, and Claimant continues to gain weight and has not limited her calories.  Dr. Helton noted Claimant's depression controlled

on Lexapro. (Tr. 738). In the assessment, Dr. Helton listed malaise, nocturnal dyspnea, diabetic neuropathy, diabetic gastroparesis, diabetic retinopathy, cataract, angina pectoris, and GERD. (Tr. 739). Dr. Helton prescribed a medication regimen as treatment. (Tr. 739).

## IV.    The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since March 13, 2007, the application date. (Tr. 78). The ALJ found that the medical evidence establishes that Claimant has the severe impairments of insulin-dependent diabetes mellitus, obesity, chronic obstructive pulmonary disease ("COPD"), degenerative joint disease, peripheral neuropathy, and depression, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 78). The ALJ opined that Claimant has the residual functional capacity to perform sedentary work with the nonexertional limitations only occasional climbing ramps/stairs and never climb ropes/ladders/scaffolds. (Tr. 79). The ALJ further opined that Claimant can only do frequent, not constant, pushing/pulling with her lower extremities and can occasionally balance, stoop, kneel, crouch, and crawl. Claimant needs to avoid concentrated exposure to excessive vibration, pulmonary irritants, industrial hazards, and unprotected heights and work in a temperature-controlled environment. The ALJ limited Claimant to unskilled work due to symptoms associated with her mental impairment. (Tr. 79). The ALJ found that Claimant has no past relevant work. (Tr. 86).

The ALJ found Claimant was born on February 8, 1964 which is defined as a younger individual age 18-44 on the date the application was filed. (Tr. 86). The ALJ found Claimant has a limited education and able to communicate in English. The ALJ noted that the transferability of job skills is not an issue, because Claimant does not have past relevant work. Considering

Claimant's age, education, work experience, and residual functional capacity, the ALJ opined that there are jobs that exist in significant numbers in the national economy that Claimant can perform such as fabricator and wafer breaker. (Tr. 86). The ALJ concluded that Claimant has not been under a disability since March 13, 2007, the date the application was filed. (Tr. 87).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not

found to have a severe impairment, she is not eligible for disability benefits. If the claimant is

found to have a severe impairment the ALJ proceeds to step three in which he must determine

whether the impairment meets or is equal to one determined by the Commissioner to be

conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the

claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not

the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work. If the claimant can still perform past work, she is

not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

 Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." Id. The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts from

that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the

Commissioner's decision as long as there is substantial evidence in the record to support his

findings, regardless of whether substantial evidence exists to support a different conclusion. Haley

v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The claimant's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The claimant's subjective complaints relating to
     exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the
     March 7, 2013claimant's impairments.

6.   The testimony of vocational experts when required which
     is based upon a proper hypothetical question which sets forth the claimant's
impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008)).  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion."  Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.  Id.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to cite any medical evidence to support his findings. Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed because the expert relied on the RFC.

A.    Residual Functional Capacity

Claimant contends that the ALJ erred in formulating her residual functional capacity by failing to cite any medical evidence to support his findings.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical

professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

In his decision the ALJ thoroughly discussed the objective medical evidence not supporting the severity of her symptoms, her impairments controlled by treatment and medications, noncompliance with treatment recommendations, her daily activities, and poor earnings record. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities).  The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating or consultative physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work except for a time period.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).   The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38

F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  In particular, the ALJ noted that the medical record does not repeatedly document any diabetic complications such as significant weight loss, deep ulcers, end organ damage, cerebral vascular disease, coronary artery disease, congestive heart failure, neuropathy, nephropathy, retinopathy, peripheral vascular disease, congestive heart failure."  (Tr. 84).  Indeed, extensive cardiac testing revealed essentially normal results.  Further, several medical sources recommended to Claimant to increase her exercise level.  See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)("Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.").

In support of his credibility findings, the ALJ noted that no physician who examined Claimant found her to have limitations consistent with disability.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work.").  The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating her credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was her failure to pursue more aggressive treatment.  See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999).  In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional limitations.  Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability).  Likewise, the ALJ  noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive

medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)(lack of ongoing treatment is inconsistent with complaints of disabling condition).

The ALJ also found Claimant's impairments to be controlled by treatment. Conditions which can be controlled by treatment are not disabling. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1998) (holding that a medical condition that can be controlled by treatment is not disabling). Indeed, at the hearing, Claimant testified that her medications help. Conditions which can be controlled by treatment are not disabling.

Without good reason, failure to follow prescribed treatment is grounds for denying an application for benefits. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). The ALJ discussed Claimant's history of noncompliance of medical professionals recommendations. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against a claimant's credibility). The ALJ noted how Claimant had been noncompliant the numerous medical sources advising Claimant to stop smoking. Dr. Smith instructed Claimant to use crutches and recommended smoking cessation, but the record does not reflect that she did so. Likewise, the treatment notes regarding her fractured ankle indicated noncompliance with medical advice. The ALJ properly considered the effect upon Claimant's credibility of her noncompliance with treatment recommendations. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001)

(ALJ may consider noncompliance with medical treatment in discrediting subjective complaints);

Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (if adequately explained and supported,

credibility findings are for the ALJ to make).  Further, doctors advised Claimant to lose weight to

improve her health particularly with respect to her diabetes mellitus.  Not only did she fail to heed

the medical recommendations, as noted by the ALJ, in January 2010, Dr. Helton noted her

continued weight gain and failure to limit her calories as recommended.  Likewise, the medical

records show that Claimant failed to stop smoking even though she received numerous

admonitions from treating sources to stop smoking.  See Choate v. Barnhart, 457 F.3d 865, 872

(8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating

physician's directions, including failing to take prescription medications, seek treatment, and quit

smoking."); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105

F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to

treatment do not support a finding of disability, and failure to follow a prescribed course of

remedial treatment, including cessation of smoking, without good reason is grounds for denying an

application of benefits).  Therefore, Claimant's failure to cease smoking detracts from her claim

that she is unable to engage in substantial gainful employment.

A claimant's daily activities are proper considerations when evaluating his credibility.  See

Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011); Halverson v. Astrue, 600 F.3d 922, 932

(8th Cir. 2010).  Claimant testified that she could stand for a few hours, sit for six to eight hours,

walk a half a block, and lift as much as ten pounds.  Claimant reported doing the cooking for her

household, performing household chores with assistance, and enjoying playing cards.  "'Acts which

are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's

credibility'." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (quoting Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)). The ALJ opined that such abilities suggest Claimant would be capable of at least sedentary work activity.[3]

Finally, the ALJ noted that Claimant's work history and earnings record severely detract from her credibility regarding the severity of her impairments alleged and her overall motivation to work versus motivation for benefits inasmuch as her record documents poor and overall inconsistent earnings. The ALJ noted that " claimant's earnings over the years have been extremely low with only one year of earnings over $5500 since her 18th birthday in 1982. One year of Supplemental Security Income benefits at the full federal monthly rate would provide the claimant considerably more annual income than she has ever achieved through working" (Tr. 85). A poor work history lessens a Claimant's credibility. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); see also Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability."); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms). The ALJ further opined that "[h]er earnings record ... certainly does not support the proposition that, but for her alleged impairments, she would be working and engaging in substantial gainful activity. Such a scenario

---

[3] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); SSR 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

could motivate the claimant, either consciously or unconsciously, to exaggerate her symptoms." (Tr. 85).

The undersigned notes that Claimant stopped working not because of any of her alleged disabling impairments. At the first hearing, Claimant testified that she stopped working in 2002 after recovering from a partial hysterectomy, and the owner of the Blue Owl told her she no longer had a job. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability).

While certainly not dispositive, the undersigned notes that, while receiving some emergency room treatment, Claimant did not complain of fatigue. Indeed, as noted by the ALJ, "there is no evidence that she has reported that she is chronically fatigued to her physicians nor has she reported significant side effects from medications." (Tr. 85). Indeed, during her visit on January 19, 2010, Dr. Helton noted no fatigue and continued to weight gain without limiting her calories. Allegations of disabling symptoms can be discredited when no such complaints are made while receiving other treatment. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). In relevant part, the ALJ included nonexertional limitations of only occasionally climbing ramp/stairs and never

climbing ropes/ladders/scaffolds; frequently, not constantly, pushing/pulling with her lower extremities; and only occasionally balancing, stooping, kneeling, crouching, and crawling. The ALJ also included the limitations of avoiding concentrated exposure to excessive vibration, pulmonary irritants, industrial hazards, and unprotected heights; and work in temperature-controlled environment. The ALJ found that Claimant has the residual functional capacity to perform the sedentary unskilled work.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's

credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the objective medical evidence not supporting the severity of her symptoms, her impairments controlled by treatment and medications, noncompliance with treatment recommendations, her daily activities, and poor earnings record. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain). The undersigned finds that substantial evidence supports the ALJ's finding the medical records do not support the extent of Claimant's subjective complaints of pain. See Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough that reasonable mind might accept it as adequate to support decision).

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.          Vocational Expert Testimony

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed because the expert relied on the RFC.

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform.  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).  The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant.  The question must "precisely set out the claimant's particular physical and mental impairments."  Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).  As discussed above, the ALJ found that the medical record is devoid of any doctor finding or imposing any significant mental or physical limitations upon Claimant's functional capacity during the relevant time period.  Likewise, the ALJ noted that although Claimant's treating physician has prescribed anti-depressants, the medical record fails to document any ongoing mental health treatment by a psychologist or psychiatrist, or even a counselor.  Because of the lack of mental health treatment received by Claimant, Dr. Sklar evaluated Claimant on referral by disability determinations.  Based on his examination, Dr. Sklar noted that Claimant is not receiving any outpatient psychiatric treatment and has not history of hospitalization for psychiatric treatment.  Although Claimant reported having problems forgetting things, Dr. Sklar observed during the examination Claimant showed no

signs of conversational wondering, no rambling in her conversation and thinking, and she stayed on track and assessed her GAF to be 65. When formulating Claimant's RFC, the ALJ gave Claimant all possible benefit of the doubt with respect to Dr. Sklar's findings and determined that Claimant is limited to unskilled work.

In addition, the undersigned notes that the ALJ based his hypothetical question on medical evidence contained in the record as a whole. Giving consideration to the medical evidence as a whole, the ALJ limited Claimant to sedentary exertional jobs. Accordingly, Claimant's claim that the hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the RFC should be denied. This claim is without merit inasmuch as the hypothetical included those impairments the ALJ found credible. A proper hypothetical must include only those impairments accepted as true by the ALJ. Pearsall, 274 F.3d at 1220. Furthermore, an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities." Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments "significantly restricted his ability to perform gainful employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as a fabricator and wafer breaker with such jobs existing in significant numbers in the local and national economies. The vocational

expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform unskilled work at the sedentary level of exertion. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the decision of the Commissioner be affirmed.

Judgment shall be entered accordingly.

                        /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of March, 2013.